## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN
## GREEN BAY DIVISION

| | | |
|---|---|---|
| **HULL & MACHINERY UNFERWRITERS OF THE *M/V ROGER BLOUGH*, as Subrogees and/or Assignees of the Owners and Managers of the *M/V Roger Blough*,** | ) ) ) ) ) ) | **CASE NO. 1:23-CV-00128** |
| **Plaintiffs,** | ) ) ) | |
| -vs.- | ) ) | **COMPLAINT** |
| **POWRMATIC, INC.,** 2906 Baltimore Boulevard Finksburg, Maryland 21048 | ) ) ) ) ) | **(Jury Demand Endorsed Hereon)** |
| and | ) ) | |
| **TWEET/GAROT MECHANICAL, INC.,** 325 Reid Street De Pere, Wisconsin 54115 | ) ) ) ) ) | |
| and | ) ) | |
| **CARLIN COMBUSTION TECHNOLOGY, INC.,** 126 Bailey Road North Haven, Connecticut 06473 | ) ) ) ) ) ) | |
| and | ) ) | |
| **JOHNSON CONTROLS, INC.,** 5757 North Green Bay Avenue Milwaukee, Wisconsin 53201 | ) ) ) ) ) | |
| and | ) ) | |
| **TECO-WESTINGHOUSE MOTOR COMPANY, INC.,** 5100 North Interstate Highway 35, Suite A Round Rock, Texas 78681 | ) ) ) ) ) ) | |
| and | ) ) | |

**TRANE TECHNOLOGIES COMPANY,** )
**LLC,** )
800-E Beaty Street )
Davidson, North Carolina 28036 )
  )
    and )
  )
**FINCANTIERI MARINE GROUP, LLC,** )
3301 South Packerland Drive )
De Pere, Wisconsin 54115 )
  )
    **Defendants.** )
  )

Plaintiffs Hull & Machinery Underwriters of the *M/V Roger Blough*, as Subrogees and/or Assignees of the Owners and Managers of the *M/V Roger Blough* (collectively, "Hull Underwriters"), by and through their undersigned counsel, and for their Complaint for Monetary Damages against Defendants Powrmatic, Inc., Tweet/Garot Mechanical, Inc., Carlin Combustion Technology, Inc., Johnson Controls, TECO-Westinghouse Co., Trane Technologies, and Fincantieri Marine Group, LLC state as follows:

## NATURE OF ACTION

1.    Hull Underwriters file this action to seek subrogation and recovery of money damages relating to the constructive total loss of the *M/V Roger Blough* while in her winter layup berth on the navigable waters of Lake Michigan at Fincantieri Bay Shipbuilding in Sturgeon Bay, Wisconsin.

2.    Hull Underwriters bring this action, and each of the claims set forth herein, under the general maritime law of the United States, or, in the alternative, under any corresponding and applicable state law(s).

## PARTIES

3.     Hull Underwriters are collectively the those underwriters and syndicates engaged in the business of marine insurance at Lloyd's, London, and subscribing to a hull and machinery and increased value policy of marine insurance covering Key Lakes, Inc. and its parents, subsidiaries, affiliates, associates, and stakeholders, and, amongst other vessels, the *Roger Blough*, which policy bears Policy No. MHAUL2000379, effective 0001 hours CST on May 10, 2020 until 0001 hours CST on May 10, 2021 ("the Policy"). A true and accurate copy of the Policy slip is attached hereto as Exhibit A.

4.     The lead underwriter is XL Catlin, for and on behalf Lloyd's Underwriter Syndicate No. 2003 XLC. Other participating underwriters are Chubb Global Markets, for and on behalf of Lloyd's Underwriter Syndicate No. 2488 CGM, Hiscox Syndicates, for and on behalf of Lloyd's Underwriter Syndicate No. 0033 HIS, Markel International Limited, for and on behalf of Lloyd's Underwriter Syndicate No. 3000 MKL, Royal and Sun Alliance Insurance PLC, for and on behalf of The Marine Insurance Company Limited 3319-03-0, Talbot Underwriting Limited, for and on behalf of Lloyd's Underwriter Syndicate No. 1183 TAL, Arch Insurance International, for and on behalf of Arch Insurance (UK) Limited, LIRMA A6303, Apollo Syndicate Management Ltd., for and on behalf of Apollo Hull Consortium 9595 2019, Ascot Syndicate, for and on behalf of Lloyd's Underwriter Syndicate No. 1414 ASC, Allianz Global Corporate and Specialty SE, for and on behalf of Allianz Global Corporate and Specialty SE, Marine, XIS 3823014, and Aon Underwriting Managers, for and on behalf of Lloyd's Underwriter Syndicate No. ACT3 4515 B1526CBSPS2000009 Marine Hull – QPS 5555 (40.6666%), LIB 4472 (21.9167%), RNR 1458 (19.2067%), AFB 3623 18.21%). All participating underwriters and syndicates participating in the Policy are identified in the Policy

3

slip.  Each of the Hull Underwriters is a foreign subject and not a citizen of the United States or any of the several states.

5.    Defendant Powrmatic, Inc. ("Powrmatic") is a corporation organized pursuant to the laws of the State of Maryland and which maintains its principal place of business in the State of Maryland.  Powrmatic designs, manufactures, and supplies HVAC systems, including oil-fired furnaces.  Powrmatic sells and distributes these systems for use in the State of Wisconsin. Powrmatic did, in fact, design, manufacture, and supply the furnace that was installed and used aboard the *Roger Blough* in the State of Wisconsin.

6.    Defendant Tweet/Garot Mechanical, Inc. ("Tweet/Garot") is a corporation organized pursuant to the laws of the State of Wisconsin and which maintains its principal place of business in the State of Wisconsin.  Tweet/Garot is licensed and authorized to transact business in the State of Wisconsin, and in fact does transact business in the State of Wisconsin. Tweet/Garot provides marine services to vessel operators, including providing the installation and service of a furnace installed aboard the *Roger Blough* in the State of Wisconsin.  Upon information and belief, Tweet/Garot also provided technical input, specifications, requirements in connection with the design and manufacture of a furnace installed aboard the *Roger Blough* in the State of Wisconsin.  Upon information and belief, Tweet/Garot also participated in the design, manufacture, distribution, supply, and/or sale of a furnace installed aboard the *Roger Blough* in the State of Wisconsin.

7.    Defendant Carlin Combustion Technology, Inc. ("Carlin Combustion") is a corporation organized pursuant to the laws of the State of Connecticut and which maintains its principal place of business in the State of Connecticut.  Carlin Combustion manufactures and supplies burners and other components for use in residential and commercial HVAC systems.

Carlin Combustion sells and distributes these burners and other components for use in the State of Wisconsin. Carlin Combustion did, in fact, design, manufacture, and supply the burner assembly component of a furnace installed aboard the *Roger Blough* in the State of Wisconsin.

8. Defendant Johnson Controls, Inc. is a corporation organized pursuant to the laws of the State of Wisconsin and which maintains its principal place of business in the State of Wisconsin. Johnson Controls manufactures and supplies control switches and systems and other components for use in residential and commercial HVAC systems. Johnson Controls sells and distributes these switches and other components for use in the State of Wisconsin. Johnson Controls did, in fact, design, manufacture, and supply the high temperature control and fan limit switch components of a furnace installed aboard the *Roger Blough* in the State of Wisconsin.

9. Defendant TECO-Westinghouse Motor Company, Inc. ("TECO-Westinghouse") is a corporation organized pursuant to the laws of the State of Delaware and which maintains its principal place of business in the State of Texas. TECO-Westinghouse is licensed and authorized to transact business in the State of Wisconsin, and in fact does transact business in the State of Wisconsin. TECO-Westinghouse manufactures and supplies electric motors for use in residential and commercial HVAC systems. TECO-Westinghouse sells and distributes these motors for use in the State of Wisconsin. TECO-Westinghouse did, in fact, design, manufacture, and supply the motors of a furnace installed aboard the *Roger Blough* in the State of Wisconsin.

10. Defendant Trane Technologies Company, LLC ("Trane Technologies") is a limited liability company organized pursuant to the laws of the State of Delaware and which maintains its principal place of business in the State of North Carolina. Trane Technologies is licensed and authorized to transact business in the State of Wisconsin, and in fact does transact business in the State of Wisconsin. Upon information and belief, Trane Technologies provided

technical input, specifications, requirements in connection with the design and manufacture of a furnace installed aboard the *Roger Blough* in the State of Wisconsin. Upon information and belief, Trane Technologies participated in the design, manufacture, distribution, supply, and/or sale of a furnace installed aboard the *Roger Blough* in the State of Wisconsin.

11.     Defendant Fincantieri Marine Group, LLC ("Fincantieri") is a limited liability company organized pursuant to the laws of the State of Nevada and which maintains its principal place of business in the State of Wisconsin. Fincantieri is licensed and authorized to transact business in the State of Wisconsin, and in fact does transact business in the State of Wisconsin. Fincantieri operates the Fincantieri Bay Shipbuilding shipyard in Sturgeon Bay, Wisconsin and provides marine services to vessels berthed there. Fincantieri participated in the installation and service of a furnace installed aboard the *Roger Blough* in the State of Wisconsin.

**JURISDICTION AND VENUE**

12.     This matter is within the admiralty jurisdiction of this Court pursuant to Article III, Section 2 of the United States Constitution, 28 U.S.C. § 1333, and the general maritime law of the United States. The events at issue in this matter occurred upon the navigable waters of the United States and had a significant impact on interstate maritime commerce.

13.     This matter is also within the diversity jurisdiction of this Court pursuant to Article III, Section 2 of the United States Constitution, and 28 U.S.C. § 1332. Each of the Hull Underwriters is a foreign national and thus is not a corporate citizen of the same state as any of the defendants. The amount in controversy, exclusive of interest and costs, far exceeds $75,000.00.

14.     To the extent any of the claims set forth herein are subject to the law(s) of one or more of the several states, this matter is within the supplemental jurisdiction of this Court pursuant to 28 U.S.C. § 1367.

15.     This Court has personal jurisdiction over each of the defendants pursuant to Wisc. Stat. § 801.05.

16.     This Court is the appropriate venue in which to adjudicate this matter pursuant to 28 U.S.C. § 1391. The events at issue in this matter transpired within the bounds of this judicial district.

## FACTS

### The M/V Roger Blough, *Her Unique Unloading System, and Her Great Lakes Service*

17.     The *M/V Roger Blough* is a Great Lakes self-unloading bulk carrier bearing Official Number 533062, IMO Number 722138, and Call Sign WDH7559.

18.     The *Roger Blough* measures 833.2 feet long with a capacity of approximately 46,533 dead weight tonnes.

19.     The *Roger Blough* was built from approximately 1968 to 1971 at the American Shipbuilding Company shipyard in Lorain, Ohio for what was then the U.S. Steel Corporation Great Lakes Fleet. The *Roger Blough* was christened in June 1972 and sailed on her maiden voyage that same month.

20.     The *Roger Blough* operated in Great Lakes service for the entirety of her life, carrying taconite and other bulk cargoes to various destinations on the Great Lakes.

21.     The *Roger Blough* is equipped with a unique unloading system, utilizing a retractable and extendable shuttle boom at her stern, as opposed to the more traditional stick boom utilized on most self-unloading bulk carriers. The unique design of the unloading system

Case 1:23-cv-00128-WCG   Filed 01/31/23   Page 7 of 25   Document 1

was meant to allow the *Roger Blough* to provide dedicated service to certain U.S. Steel Corp. facilities in Gary, Indiana and Conneaut, Ohio for her original owners.

22.     Cargo was kept and transported in the vessel's cargo holds.  During unloading operations, cargo would empty from the cargo holds through a series of mechanical gates and onto one of two conveyor belts in the unloading tunnels, one port and one starboard, which ran beneath the cargo holds.  The conveyor belts would carry cargo aft, transferring the cargo to one of two incline cargo belts.  The incline cargo belts would carry cargo further aft, depositing it into a hopper.  Cargo would transfer from the hopper to the shuttle boom mechanism, which would extend from the side of the vessel and offload the cargo to shore.

23.     The *Roger Blough* operated in this service until her untimely loss to fire on February 1, 2021.

### The **Roger Blough's** *Engineering Spaces and Winter Furnace*

24.     The *Roger Blough* was equipped with two houses, one forward and one aft.  The forward house contained deck officers' quarters and navigational spaces.  The aft house contained the engineering spaces, additional crew quarters, and the galley.

25.     An oil-fired gas furnace was located in the forward part of the lowest level of the engineering spaces of the aft house.  The furnace, colloquially known as "the winter furnace," was not used during the navigational season.  The winter furnace was only used during winter layup, the intervening period between navigating seasons, lasting from approximately December to March when ice tends to cover the Great Lakes.  During this time, Great Lakes cargo vessels traditionally enter a layup berth at a Great Lakes shipyard or other port to undergo maintenance and repair work until the next navigating season begins.

8

26. The winter furnace aboard the *Roger Blough* serves two functions. First, the winter furnace provided ambient heat to the engineering spaces during winter layup. Second, the winter furnace also provided heat to keep the vessel's sea chests from freezing and rupturing during winter layup.

27. The original winter furnace aboard the *Roger Blough* was a Dravo Corp. oil-fired burner furnace capable of producing an output of 1,000,000 BTU.

28. Eventually, the vessel owners and managers of the *Roger Blough* needed to replace the winter furnace with a new unit. Vessel owner and managers engaged Tweet/Garot to source and install a new winter furnace of like kind and type. Tweet/Garot utilized Powrmatic to manufacture a furnace for this purpose.

29. Powrmatic designed and manufactured a Model CA-100 oil-fired burner furnace bearing Serial No. 0220-25731. Upon information and belief, Tweet/Garot and Trane Technologies participated in the design process for the new winter furnace, providing specifications and other details to Powrmatic.

30. As designed, the new winter furnace contained an oil-fired burner assembly. Carlin Combustion designed, manufactured, and supplied the burner assembly for the new winter furnace.

31. As designed, the new winter furnace contained a high-temperature control and fan limit switch. Johnson Controls designed, manufactured, and supplied the high-temperature control and fan limit switch for the new winter furnace.

32. As designed, the new winter furnace contained two motors powering blower fans. TECO-Westinghouse designed, manufactured, and supplied the motors for the new winter furnace.

9

33.     Powrmatic delivered the new winter furnace to Tweet/Garot for installation aboard the *Roger Blough*.  In late February 2020, Tweet/Garot and Fincantieri installed the new winter furnace in the engineering spaces of the *Roger Blough*.

34.     Tweet/Garot elected to utilize the existing thermostat in the engineering spaces for the operation of the new winter furnace.  This thermostat would signal the new winter furnace to turn on when heat was called for.

35.     During the initial installation of the new winter furnace, Tweet/Garot technicians had difficulty getting the new winter furnace to ignite or start.  Tweet/Garot technicians consulted with Powrmatic and Carlin Combustion to diagnose and correct the problem. Tweet/Garot technicians made adjustments eventually resulting in the operability of the new winter furnace.

36.     The new winter furnace, however, would not remain in continuous and automatic operation for a considerable length of time, because the *Roger Blough* fit out for the 2020-2021 navigating season a few weeks later.

37.     In July 2020, the *Roger Blough* returned to layup at Fincantieri Bay Shipbuilding. During the summer and fall months, the new winter furnace was not needed and was not in operation.

### *The Malfunction of the Defective New Winter Furnace and Subsequent Service and Repair Work Leads to a Catastrophic Fire Aboard the* Roger Blough

38.     When the winter months arrived, the new winter furnace again began to malfunction.  The nature of the malfunction was, again, that the furnace would not ignite.

39.     Vessel engineering personnel attempted to diagnose and repair the malfunction. Vessel engineering personnel attempted to adjust the settings of the fuel nozzle that supplied the oil fuel to the burner.  After two attempts to make adjustments and repair the malfunction, vessel

engineering personnel stopped work, locked out the furnace, and requested service from Tweet/Garot technicians.

40. On or about December 29, 2021, Tweet/Garot technicians attended the *Roger Blough* to conduct service work on the new winter furnace. Tweet/Garot technicians adjusted an oil fuel nozzle and other settings. The furnace ignited.

41. Tweet/Garot technicians allowed the furnace to run. After approximately 20 minutes, Tweet/Garot technicians noticed that one of the furnace components was chattering. Tweet/Garot technicians did not identify which component was making noise and took no other action.

42. No other work or adjustment occurred after Tweet/Garot technicians completed their work.

43. Approximately one month later, in the early morning hours of February 1, 2021, the winter furnace suffered a catastrophic failure, resulting in a fire.

44. The fire superheated a steel deck above the furnace. A conveyor belt that was part of the unloading system was slackened and resting on top of the steel deck, as was routine to prevent damage to the conveyor belt and unloading system during layup periods.

45. The heat from the fire superheated the steel deck, transferring the heat to the conveyor belt in the space above. The heat from the fire heated the conveyor belt to the point of ignition. The conveyor belt ignited and burned. In a chain reaction, the fire spread from the conveyor belt to the starboard side incline belt. The incline belt burned up the incline tunnel to the conveyor belt on the shuttle boom unloading system. The fire spread across the shuttle boom unloading system to the portside incline belt. The fire spread down the portside incline tunnel.

11

46.     As the conveyor belts of the unloading system burned, the fire also spread to the aft house causing significant fire damage in the crew quarters and galley.

47.     At the time of the fire, the *Roger Blough* was moored at the Fincantieri Bay Shipbuilding shipyard in Sturgeon Bay, Wisconsin, on the waters of Lake Michigan.  Several other Great Lakes bulk carriers were moored immediately adjacent to the *Roger Blough*.  Smoke and soot from the fire affected some of these nearby vessels.

48.     The vessel's ship keeper, living in the aft house quarters for the winter layup period, was awakened to a smoke alarm.  The ship keeper went to investigate and determined that the fire had spread beyond the point of containment and his ability to fight the fire alone.

49.     At 0131 hours CST, the vessel's centralized alarm system activated the fire alarm. At 0132 hours CST, the vessel's centralized alarm system notified the vessel phone, a second ship keeper, and shipyard security personnel.  Shipyard security personnel summoned first responders.  First responders began arriving at the vessel within ten minutes of the first alarm, at 0142 hours CST.

50.     The vessel's ship keeper assisted first responders in providing direction around the vessel.

51.     First responders declared the fire extinguished and cleared the vessel at 1557 hours CST.

52.     After the conclusion of firefighting efforts, government and private forensic investigators boarded the vessel and determined that the new winter furnace was the cause and origin of the fire.  The new winter furnace exhibited significant fire and heat damage, and no other vessel equipment or component exhibited burn patterns or damage lower than the new winter furnace.  Fire and heat damage was also evident in the areas surrounding the winter

12

furnace, including the bilge, the forward bulkhead of the engineering spaces, the steel deck above the winter furnace, and nearby vessel equipment.

### *The Constructive Total Loss of the* **Roger Blough** *and Damages Resulting from the Fire*

53.     The vessel owners and managers made every effort to keep the *Roger Blough* from becoming a constructive total loss.  Repairs to return the vessel to an operating condition, however, would require significant expenditures, including dry-docking; asbestos and lead paint abatement and cleaning; the replacement of electrical distribution and control systems, including most cabling, the main switchboard, motor control centers, fire detection, ballast controls, propulsion controls, motors, and emergency generators; the replacement of approximately 452 short tons of vessel structural steel; the replacement of piping and auxiliary systems; the replacement of the steam system controls; significant repairs to main engine components; the complete overhaul of the aft house accommodations; and repair or replacement of the shuttle boom and unloading system.

54.     Various repair scenarios were considered, each of which would require the investment of repair costs far exceeding $50 million.

55.     The hull and machinery and increased value Policy providing cover to the *Roger Blough* contains an agreed value for the vessel in the amount of $32 million and an increased value for the vessel in the amount of $8 million.  The Policy does not impose a deductible the event of a constructive total loss.

56.     In addition to the loss of the vessel, vessel owners and managers incurred at least $3,133,917.38 in unavoidable expenses associated with the loss, including costs associated with firefighting response, cleanup operations, damage assessment, machinery preservation, tool and equipment supply charges, technical supervision costs.

57.     Hull Underwriters paid vessel owners $40 million under the terms of the Policy. Hull Underwriters have and may continue to reimburse vessel owners and managers for the unavoidable expenses vessel owners and managers have incurred.

58.     Under the terms of the Policy, Hull Underwriters are subrogated to the rights of the vessel owners and managers to recover the moneys expended in connection with the loss of the vessel.  Hull Underwriters are also recipients of an assignment from vessel owners and managers for the pursuit of claims for unreimbursed unavoidable expenses vessel owners and managers have incurred.

### COUNT I
### STRICT PRODUCT LIAIBILITY
**(Against Powrmatic, Tweet/Garot, and Trane Technologies)**

59.     Hull Underwriters incorporate the allegations set forth in Paragraph 1 through Paragraph 58 of their Complaint as if Hull Underwriters had fully rewritten these allegations herein.

60.     Powrmatic designed, manufactured, and sold the new winter furnace at issue.  The new winter furnace reached the *Roger Blough* without substantial change from the condition in which Powrmatic sold it.

61.     Upon information and belief, Tweet/Garot and Trane Technologies provided technical input, specifications, requirements, and guidance to Powrmatic in connection with the design and manufacture of the new winter furnace.  Tweet/Garot and Trane Technologies participated in the design, manufacture, distribution, supply, and/or sale of the new winter furnace at issue.  The new winter furnace reached the *Roger Blough* without substantial change from the condition in which Tweet/Garot and Trane Technologies sold it.

14

62. Powrmatic's design of the furnace was defective and unreasonably dangerous for its normal use as a winter layup furnace in the engineering spaces of the *Roger Blough*. Specifically, and without limitation, the new winter furnace was defective in design in that it did not contain adequate safety control systems that would have prevented the malfunction of the furnace and the resulting fire.

63. Powrmatic's manufacture of the furnace was defective and unreasonably dangerous for its normal use as a winter layup furnace in the engineering spaces of the *Roger Blough*. Specifically, and without limitation, certain components of the new winter furnace were not adequately installed, within the confines of the new winter furnace itself. This includes the faulty mounting of the burner assembly, the improper wiring of the fan limit switch, and the inadequate installation of the motors and their components.

64. Each of the defects in the design or manufacture of the new winter furnace is a defect that renders the new winter furnace unreasonably dangerous. These defects, individually and/or collectively, were a proximate cause of the fire aboard the *Roger Blough*.

65. As a direct result of the existence of these defects, the *Roger Blough* was lost to fire, and Hull Underwriters have been required, and may continue to be required, to pay money for the loss of the vessel and for unavoidable expenses associated therewith. Hull Underwriters have been damaged in an amount to be determined at trial.

<u>**COUNT II**</u>
<u>**STRICT PRODUCT LIABILITY**</u>
**(Against Carlin Combustion, Johnson Controls, and TECO-Westinghouse)**

66. Hull Underwriters incorporate the allegations set forth in Paragraph 1 through Paragraph 65 of their Complaint as if Hull Underwriters had fully rewritten these allegations herein.

15

67. Carlin Combustion designed, manufactured, and sold the burner assembly of the new winter furnace at issue. The burner assembly reached the *Roger Blough* without substantial change from the condition in which Carlin Combustion sold it to Powrmatic.

68. The Carlin Combustion burner assembly was defective when it left the possession and control of Carlin Combustion. Specifically, and without limitation, the burner assembly was defective in that it did not provide for adequate mounting of the burner assembly.

69. Johnson Controls designed, manufactured, and sold the high temperature and fan limit switch of the new winter furnace at issue. The high temperature and fan limit switch reached the *Roger Blough* without substantial change from the condition in which Johnson Controls sold it to Powrmatic.

70. The Johnson Controls high temperature and fan limit switch was defective when it left the possession and control of Johnson Controls. Specifically, and without limitation, the high temperature and fan limit switch was defective in that it did not include the proper wiring to allow its correct functionality.

71. TECO-Westinghouse designed, manufactured, and sold the fan motors of the new winter furnace at issue. The motors reached the *Roger Blough* without substantial change from the condition in which TECO-Westinghouse sold them to Powrmatic.

72. The TECO-Westinghouse motors were defective when they left the possession and control of TECO-Westinghouse. Specifically, and without limitation, the motors were unable to provide sufficient strength to ventilate combustion air exhaust and prevent soot build-up in the combustion chamber.

73.     Each of the defects in the design or manufacture of the new winter furnace is a defect that renders the new winter furnace unreasonably dangerous.  These defects, individually and/or collectively, were a proximate cause of the fire aboard the *Roger Blough*.

74.     As a direct result of the existence of these defects, the *Roger Blough* was lost to fire, and Hull Underwriters have been required, and may continue to be required, to pay money for the loss of the vessel and for unavoidable expenses associated therewith.  Hull Underwriters have been damaged in an amount to be determined at trial.

**COUNT III**
**PRODUCT LIAIBILITY – NEGLIGENCE**
**(Against Powrmatic, Tweet/Garot, and Trane Technologies)**

75.     Hull Underwriters incorporate the allegations set forth in Paragraph 1 through Paragraph 74 of their Complaint as if Hull Underwriters had fully rewritten these allegations herein.

76.     Powrmatic designed, manufactured, and sold the new winter furnace at issue.  The new winter furnace reached the *Roger Blough* without substantial change from the condition in which Powrmatic sold it.

77.     Upon information and belief, Tweet/Garot and Trane Technologies provided technical input, specifications, requirements, and guidance to Powrmatic in connection with the design and manufacture of the new winter furnace.  Tweet/Garot and Trane Technologies participated in the design, manufacture, distribution, supply, and/or sale of the new winter furnace at issue.  The new winter furnace reached the *Roger Blough* without substantial change from the condition in which Tweet/Garot and Trane Technologies sold it.

78.     Powrmatic, Tweet/Garot, and Trane Technologies had a legal duty to exercise reasonable care in the design and manufacture of the new winter furnace.  Powrmatic,

17

Tweet/Garot, and Trane Technologies also had a legal duty to warn the vessel owners and managers of the *Roger Blough* if the new winter furnace, as designed, manufactured, and/or installed, was not suitable for use in a commercial marine environment.

79.     Powrmatic, Tweet/Garot, and Trane Technologies failed to exercise reasonable care in the design and manufacture of the new winter furnace. Specifically, and without limitation, Powrmatic, Tweet/Garot, and Trane Technologies failed to exercise reasonable care in the design of the new winter furnace as a result of their individual and/or collective failure to include adequate safety control systems that would have prevented the malfunction of the furnace and the resulting fire. Powrmatic, Tweet/Garot, and Trane Technologies failed to exercise reasonable care in the manufacture of the new winter furnace as a result of their individual and/or collective failure to insure adequate installation of components of the winter furnace, including the mounting of the burner assembly, the wiring of the fan limit switch, and the installation of fan motors and their components.

80.     Powrmatic, Tweet/Garot, and Trane Technologies failed to warn the vessel owners and managers of the *Roger Blough* that the new winter furnace, as designed, manufactured, and/or installed, was not suitable for use in a commercial marine environment.

81.     Each of these failures, individually and/or collectively, was a proximate cause of the fire aboard the *Roger Blough*.

82.     As a direct result of the existence of these failures, the *Roger Blough* was lost to fire, and Hull Underwriters have been required, and may continue to be required, to pay money for the loss of the vessel and for unavoidable expenses associated therewith. Hull Underwriters have been damaged in an amount to be determined at trial.

18

**PRODUCT LIAIBILITY – NEGLIGENCE**
**(Against Carlin Combustion, Johnson Controls, and TECO-Westinghouse)**

83.    Hull Underwriters incorporate the allegations set forth in Paragraph 1 through Paragraph 82 of their Complaint as if Hull Underwriters had fully rewritten these allegations herein.

84.    Carlin Combustion designed, manufactured, and sold the burner assembly of the new winter furnace at issue.  The burner assembly reached the *Roger Blough* without substantial change from the condition in which Carlin Combustion sold it to Powrmatic.

85.    Johnson Controls designed, manufactured, and sold the fan limit switch of the new winter furnace at issue.  The fan limit switch reached the *Roger Blough* without substantial change from the condition in which Johnson Controls sold it to Powrmatic.

86.    TECO-Westinghouse designed, manufactured, and sold the fan motors of the new winter furnace at issue.  The motors reached the *Roger Blough* without substantial change from the condition in which TECO-Westinghouse sold them to Powrmatic.

87.    Carlin Combustion, Johnson Controls, and TECO-Westinghouse had a legal duty to exercise reasonable care in the design and manufacture of their respective components of the new winter furnace.  Carlin Combustion, Johnson Controls, and TECO-Westinghouse also had a legal duty to warn the vessel owners and managers of the *Roger Blough* if their respective components of the new winter furnace, as designed, manufactured, and/or installed, were not suitable for use in a commercial marine environment.

88.    Carlin Combustion failed to exercise reasonable care in the design and manufacture of the burner assembly of the new winter furnace.  Specifically, and without limitation, Carlin Combustion failed to exercise reasonable care in the design and manufacture of

the burner assembly of the new winter furnace as a result of the failure of Carlin Combustion to provide adequate mounting for the burner assembly.

89.     Johnson Controls failed to exercise reasonable care in the design and manufacture of the fan limit switch of the new winter furnace.  Specifically, and without limitation, Johnson Controls failed to exercise reasonable care in the design and manufacture of the fan limit switch of the new winter furnace as a result of the failure of Johnson Controls to include proper wiring to allow its correct functionality.

90.     TECO-Westinghouse failed to exercise reasonable care in the design and manufacture of the fan motors of the new winter furnace.  Specifically, and without limitation, TECO-Westinghouse failed to exercise reasonable care in the design and manufacture of the fan motors of the new winter furnace as a result of the failure of TECO-Westinghouse to furnish motors of sufficient strength to ventilate combustion air exhaust and prevent soot build-up in the combustion chamber.

91.     Carlin Combustion, Johnson Controls, and TECO-Westinghouse failed to warn the vessel owners and managers of the *Roger Blough* that the new winter furnace, as designed, manufactured, and/or installed, was not suitable for use in a commercial marine environment.

92.     Each of these failures, individually and/or collectively, was a proximate cause of the fire aboard the *Roger Blough*.

93.     As a direct result of the existence of these failures, the *Roger Blough* was lost to fire, and Hull Underwriters have been required, and may continue to be required, to pay money for the loss of the vessel and for unavoidable expenses associated therewith.  Hull Underwriters have been damaged in an amount to be determined at trial.

20

**COUNT V**
**BREACH OF IMPLIED WARRANTY OF WORKMANLIKE SERVICE**
**(Against Tweet/Garot and Fincantieri)**

94.     Hull Underwriters incorporate the allegations set forth in Paragraph 1 through Paragraph 93 of their Complaint as if Hull Underwriters had fully rewritten these allegations herein.

95.     Vessel owners and managers of the *Roger Blough* were party to a contract for maritime services with Tweet/Garot.  The purchase order vessel owners and managers issued to Tweet/Garot provided the applicable contractual terms.

96.     Implicit in the agreements between vessel owners and managers and Tweet/Garot was a warranty of workmanlike performance or service.

97.     Vessel owners and managers of the *Roger Blough* were party to a contract for maritime services with Fincantieri.  The purchase order vessel owners and managers issued to Fincantieri provided the applicable contractual terms.

98.     Implicit in the agreements between vessel owners and managers and Fincantieri was a warranty of workmanlike performance or service.

99.     Tweet/Garot and Fincantieri failed to perform their obligations skillfully, carefully, diligently, and in a workmanlike manner.  Specifically, and without limitation, Tweet/Garot and Fincantieri failed to properly install the new winter furnace by failing to ensure that the new winter furnace was equipped with adequate and properly installed safety control systems, by failing to install adequate intake air and combustion air exhaust runs, and by actively disconnecting the carbon dioxide fire suppression system of the vessel.

100.     Tweet/Garot failed to perform their obligations skillfully, carefully, diligently, and in a workmanlike manner.  Specifically, and without limitation, Tweet/Garot failed to make

21

appropriate recommendations for the procurement of the new winter furnace, failed to diagnose the ongoing malfunctions with the new winter furnace during service calls, failed to properly service the new winter furnace during service calls, and inadequately performed service and repairs.

101.    Each of these failures, individually and/or collectively, was a proximate cause of the fire aboard the *Roger Blough*.

102.    As a direct result of the existence of these failures, the *Roger Blough* was lost to fire, and Hull Underwriters have been required, and may continue to be required, to pay money for the loss of the vessel and for unavoidable expenses associated therewith.  Hull Underwriters have been damaged in an amount to be determined at trial.

**COUNT VI**
**NEGLIGENCE**
**(Against Tweet/Garot and Fincantieri)**

103.    Hull Underwriters incorporate the allegations set forth in Paragraph 1 through Paragraph 102 of their Complaint as if Hull Underwriters had fully rewritten these allegations herein.

104.    Tweet/Garot and Fincantieri were providers engaged in the business of furnishing marine services to the *Roger Blough*.  Marine service providers have a legal duty to perform their work in a diligent and workmanlike manner, and with reasonable care, skill, and diligence.

105.    Tweet/Garot and Fincantieri failed to perform their work diligently, in a workmanlike manner, and with reasonable care, skill, and diligence.  Specifically, and without limitation, Tweet/Garot and Fincantieri failed to properly install the new winter furnace by failing to ensure that the new winter furnace was equipped with adequate and properly installed

safety control systems, by failing to install adequate intake air and combustion air exhaust runs, and by actively disconnecting the carbon dioxide fire suppression system of the vessel.

106.     Tweet/Garot failed to perform its work diligently, in a workmanlike manner, and with reasonable care, skill, and diligence.  Specifically, and without limitation, Tweet/Garot failed to make appropriate recommendations for the procurement of the new winter furnace, failed to diagnose the ongoing malfunctions with the new winter furnace during service calls, failed to properly service the new winter furnace during service calls, and inadequately performed service and repairs.

107.     Each of these failures, individually and/or collectively, was a proximate cause of the fire aboard the *Roger Blough*.

108.     As a direct result of the existence of these failures, the *Roger Blough* was lost to fire, and Hull Underwriters have been required, and may continue to be required, to pay money for the loss of the vessel and for unavoidable expenses associated therewith.  Hull Underwriters have been damaged in an amount to be determined at trial.

**WHEREFORE**, Plaintiffs Hull Underwriters of the *M/V Roger Blough* pray for judgment in their favor as follows:

(1)     for compensatory damages in an amount to be determined at trial;

(2)     for prejudgment interest in an amount to be determined at trial;

(3)     for an aware of costs and expenses, including attorneys' fees; and,

(4)     for all other relief that the Court deems necessary, just, and proper.

23

Respectfully submitted,

 /s/ Markus E. Apelis                              .
**PAUL D. GALEA (P29250)**
**MARKUS E. APELIS (P80275)**
GALLAGHER SHARP LLP
211 West Fort Street, Suite 660
Detroit, Michigan 48226
Phone: (313) 962-9160
Fax: (313) 962-9167
Email:pgalea@gallaghersharp.com
        mapelis@gallaghersharp.com
*Attorneys for the Plaintiffs*
*Hull Underwriters of the* M/V Roger Blough

**<u>JURY DEMAND</u>**

Plaintiffs Hull & Machinery Underwriters of the *M/V Roger Blough*, by and through their undersigned counsel and pursuant to Rule 38 of the Federal Rules of Civil Procedure, hereby demand a trial by jury on all issues so triable before the maximum number of jurors permitted by law.

       */s/ Markus E. Apelis* .
      **PAUL D. GALEA (P29250)**
      **MARKUS E. APELIS (P80275)**
      *Attorneys for the Plaintiffs*
      *Hull Underwriters of the* M/V Roger Blough